## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TERRY LYNN CHEEK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-251 (RMC)** |
| | ) | |
| **MICHAEL CHERTOFF, Secretary,** | ) | |
| **U.S. Department of Homeland Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Terry Lynn Cheek works as a Budget Coordinator in the Special Services Division ("SSD") of the U.S. Secret Service. She sues Michael Chertoff, Secretary of the Department of Homeland Security, of which the Secret Service is a constituent agency, in his official capacity. Ms. Cheek alleges that she has suffered multiple adverse employment actions because she has engaged in protected activity in opposing an unlawful employment practice and participating in the equal employment opportunity ("EEO") process. After full discovery, the Secret Service has filed a motion for summary judgment which the Court finds has merit. The Court will grant Defendant's motion for summary judgment and will dismiss the complaint.

---

[1]Effective March 1, 2003, the U.S. Secret Service was transferred from the Department of Treasury to the U.S. Department of Homeland Security ("DHS"). *See* The Homeland Security Act of 2002, 6 U.S.C. § 381 (2004). Accordingly, pursuant to Fed. R. Civ. P. 25(d)(!), the Secretary of DHS, Michael Chertoff, is automatically substituted for Mr. Basham as party defendant.

## I. BACKGROUND FACTS

Ms. Cheek has been employed by the Secret Service since 1975.[2]  She became the

Office Manager in the SSD in February 1989.  As Office Manager, Ms. Cheek's primary function

was to manage the clerical and administrative work of SSD.  Ms. Cheek was promoted in July 2001

to the position of Budget Coordinator at a GS-9 grade.  In this job, her primary functions are to

perform a variety of analytical, technical, and administrative duties in support of SSD's budget,

including setting up controls to monitor and track expenses, preparing regular budget summaries and

status reports, monitoring the flow of funds through accounts, and coordinating the payment of

SSD's bills.[3]  In September 2002, Ms. Cheek received a career ladder promotion to GS-11.

SSD has had a recurring change in managers during the time that Ms. Cheek has

worked there.  Peter Schwartz was the Special Agent In Charge ("SAIC") from September 1996 until

December 2000.  Jerry Price served as acting SAIC after Mr. Schwartz left.  James Burch became

the SAIC in April 2001 and held the position until April 2002, when Mr. Price again became acting

SAIC.  Tom Farrell became SAIC in August 2002 and stayed in the position until April 2003.  Tracy

Gast became SAIC in May 2003 and has stayed put at least until July 2005.

A desk audit of Ms. Cheek's position, among others, was conducted in 1998 to

---

[2]  The facts are taken from the Defendant's Statement of Material Facts Not in Genuine
Dispute ("Def.'s Facts") with which Ms. Cheek does not disagree unless noted.  *See* Plaintiff's
Statement of Material Facts Not in Disputed [sic] ("Pl.'s Facts").

[3]  *See* Def.'s Facts ¶ 4.  Ms. Cheek admits "Line 1" and "Line 2" of this paragraph 4--- the
timing of her promotion by then-Special Agent in Charge ("SAIC") James Burch --- but fails to
address or contest the rest of the paragraph.  Pl.'s Facts ¶ 4.  Having failed to contest these facts,
they are deemed conceded.  *See* LCvR 7(h); *see also Jackson v. Finnegan, Henderson, Farabow,
Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996); *Twist v. Meese*, 854 F.2d 1421, 1423-25
(D.C. Cir. 1988); *Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 163 (D.D.C. 2002).

determine if the position descriptions accurately portrayed the employees' duties.  As pertinent here, the desk audit included the position of Jack Henderson, a Supervisory Protective Support Technician.[4]  Following the desk audit, SSD advertised a new Administrative Officer position, for which Ms. Cheek applied.  However, the Assistant Director of the Office of Protective Operations, Carlton Spriggs, determined not to fill the vacancy after the posting closed.  Since Mr. Henderson had recently received a promotion, Ms. Cheek told SAIC Schwartz that she believed it was unfair that she did not also get a promotion to the new position.  She informed SAIC Schwartz that she was going to call the agency's Equal Employment Opportunity ("EEO") office. That same day, March 19, 2000, Ms. Cheek contacted Yvette Coles at the EEO office.  According to Ms. Cheek, Ms. Coles told her that her complaint was "not a discrimination case." Def.'s Facts ¶ 11.[5]  When Ms. Cheek tried to reach Ms. Coles at a later date, she was told that Ms. Coles had left the Secret Service.  Ms. Cheek did not seek any further EEO counseling and never filed an informal or formal complaint concerning the non-selection for the Administrative Officer position.  *Id*.

SAIC Schwartz retired from the Secret Service in December 2000.  Ms. Cheek has no knowledge that SAIC Schwartz told his successor, SAIC Burch, or any of Ms. Cheek's supervisors that she had indicated she would talk to the EEO office. Def.'s Facts ¶ 15.[6]  Mr. Burch

---

[4]  Ms. Cheek alleges that Mr. Henderson has received repeated and unorthodox grade promotions because he is a driver for the Director of the Secret Service.

[5]  *See also* Pl.'s Opp. at 2 n.1 ("Plaintiff called the agency's EEO office and spoke with EEO officer Yvette Coles to report what she believe[d] was sex discrimination based on a theory of equal pay for equal work between males and females within SSD. . . . When plaintiff contacted Coles to follow up on her complaint, Coles informed the plaintiff that she had no complaint and could not go further with it.")

[6]  Ms. Cheek denies this statement from Defendant's Facts and states that she "has no basis to know if Schwartz told Burch about her EEO complaint."  Pl.'s Facts ¶ 15.  The Court

became the SAIC in April 2001.  Before Mr. Burch's arrival, Ms. Cheek received her written, mid-year review from then Assistant Special Agent in Charge ("ASAIC") Tracy Gast.  In the review, Mr. Gast noted that, while Ms. Cheek's overall performance was "adequate," she needed to "concentrate more on her organizational skills and timeliness of assigned duties."  Def.'s Facts ¶ 17 (quoting 2000-2001 Performance Appraisal).  He also reminded Ms. Cheek that SSD required "prompt and accurate payments," and that "while the division ha[d] not incurred interest charges, USSS administrative procedures could be more closely followed."  Id. [7]

Ms. Cheek received a year-end review from SAIC Burch in August 2001.  The appraisal directed her to "force herself to sharpen her organizational skills and comply with standard USSS procedures for office management."  Def.'s Facts ¶ 18.  Her overall rating was "acceptable." [8]

---

considers these equivalent statements and certainly not sufficiently distinguishable to create a genuine issue of material fact.  It is also noteworthy that Ms. Cheek admitted ¶ 16 of Defendant's Facts, which stated that Mr. Burch "testified that he was unaware of Plaintiff's prior contact with the EEO Officer.  Plaintiff herself acknowledged that she had no specific information to suggest that Mr. Burch was aware that she had contacted Ms. Coles."  Def.'s Facts ¶ 16 (citations omitted); see Pl.'s Facts ¶ 16.

[7] Ms. Cheek admits these facts in part and denies them in part, asserting that she received only "very general comments about her performance [and] Gast never provided any specifics as to what ways he wanted her to improve or what input or supervision he wanted the plaintiff to improve upon."  Pl.'s Facts ¶ 17.  This response is not, strictly speaking, a dispute concerning the facts asserted by the Defendant, but only the addition of other facts.  It is also contradicted by the Performance Appraisal itself and by Ms. Cheek's deposition testimony.  See Def.'s Motion, Exh. A (Cheek Deposition I) at 94-96 (Mr. Gast told her she needed to be "better about delegating administrative duties," improve her "organizational skills and timeliness," make sure that "the payment of invoices was done promptly and accurately," and ensure that she "follow[ed] USSS administrative procedures more closely" with regard to the payment of invoices.).

[8] Ms. Cheek attempts to admit in part and deny in part this paragraph from Defendant's Facts.  She describes the appraisal as providing only "some general feedback" with "no specific example as to when the Plaintiff did not exercise adequate supervisory oversight or when she failed to promptly or accurate[ly] make payments to vendors."  Pl.'s Facts ¶ 18.  She further asserts that "[t]he reason as to why no interest charges had been incurred was because payment

In October 2001, the agency's remote delivery site for mail handling was shut down because of an positive test for anthrax.  As a result, SSD received no mail from the U.S. Postal Service for an unspecified period of time.  Only three of its vendors delivered their invoices by hand in the interim.

A. <u>Donated Leave</u>

On November 17, 2001, Ms. Cheek was involved in an automobile accident which prevented her return to work until February 4, 2002.  On December 12, 2001, she submitted an application to become a recipient of donated leave from other agency employees.[9]  Upon receipt of her application, SAIC Burch contacted the personnel office and was advised that Ms. Cheek needed to submit supporting medical documentation.  It appears that no immediate follow-up was done because Ms. Cheek called the personnel office on December 26, 2001, to inquire about her application.  Pl.'s Facts ¶ 24.  When she learned it had not been submitted to personnel, she began to call people in SSD and eventually spoke directly to SAIC Burch, who was out of state on vacation. *Id.*  SAIC Burch "informed her that he thought he had signed the form.  He then directed the plaintiff to call ASAIC Price and advise him to sign the form and process it." *Id.*  This is what happened and the chief of personnel sent an office-wide email on December 28, 2002, advising all Secret Service personnel that Ms. Cheek had been approved as an annual leave recipient. Def.'s Facts ¶ 27. Ms. Cheek was formally notified by memo on January 3, 2002, that her application had been approved.

on invoices had been promptly made." *Id.*; *cf.* Def.'s Motion, Exh. A (Cheek Dep. I) at 98 ("it's possible" that some payments were made late).  Her response does not contest anything stated by the Defendant and is irrelevant because the adequacy of her August 2001 performance appraisal is not at issue.

[9]  The Voluntary Leave Transfer Program allows federal employees to donate accrued annual leave to an employee in the program.

Ms. Cheek received a total of 156 hours of donated annual leave from her fellow employees and was thereby paid in full for all the time she was out of work after her car accident.

B. Temporary Change in Duties

One of the job functions performed by Ms. Cheek was to pay SSD invoices within 30 days of their receipt, as required by the Prompt Payment Act. She was not always successful and "[s]ometimes, some [invoices] slipped by." Def.'s Facts ¶ 28. She routinely paid invoices from at least 30 different vendors. SSD stopped receiving its mail on October 13, 2001. Between that time and her car accident on November 17, 2001, Ms. Cheek did not contact any of the SSD vendors to make arrangements for them to fax, email, courier, or hand-deliver their invoices.[10] At the time of her accident, there were outstanding vendor invoices on Ms. Cheek's desk, including one from Crystal Springs that was already overdue. She did not notify anyone at SSD that these invoices were awaiting payment or that she had not made alternative arrangements for vendors to submit their invoices in lieu of the mail. (While not denying any of the above, Ms. Cheek asserts that her duties fell to Mr. Henderson in her absence and that these failings should be attributed to him.)

In light of Ms. Cheek's extended absence, SAIC Burch sought assistance from outside SSD to ensure that her work was being performed and was not backing up. In January 2002, Barbara Finn, an administrative officer for the Vice Presidential Division, and Darnella Newman, the Office Manager for the Vice Presidential Division, came to SSD for two days to perform the review. Ms. Finn had performed the same kind of review approximately two years earlier, when Ms. Cheek was

---

[10] Ms. Cheek admits that she failed to make alternative arrangements to receive vendor invoices. She asserts that the Secret Service "was in the process of setting up an undercover post office box set up in Springfield, VA," and that she notified the vendors of that address once it was set up, apparently upon her return to work in February. Pl.'s Facts ¶ 31.

office manager and had been on sick leave for two weeks.  At that time, Ms. Finn reported finding

a number of problems, including loose papers and files on surfaces throughout Ms. Cheek's work

area, out-of-date personnel files, and general disorganization.  After her January 2002 review, Ms.

Finn delivered a highly critical evaluation of Ms. Cheek.  In a January 23, 2002, email to SAIC

Burch she reported:

- Several problems with SSD's checks that had not been filed but were in various locations through the office.  Checks were missing or incomplete or lacking proper authorization.  She had answered calls from vendors complaining about overdue bills going back before October 2001.  The Crystal Springs bill that had been sitting, overdue, on Ms. Cheek's desk at the time of her accident alone totaled $1,300.

- As in 2000, Ms. Finn had to clear Ms. Cheek's desk.

- Mses. Finn and Newman had to "coordinate and alphabetize hundreds of pieces of paper that had not been filed" in the Employee Personnel Files ("EPFs"), including memos from April 2001 and evaluations from the 1999-2000 evaluation cycle.

- Once the EPFs were removed from the office safe, Ms. Finn found that the files contained multiple Standard Form ("SF") 50s that should have been provided to the employees.  These SF 50s dated back to early 2000.  No EPFs had been made for any of the employees who had come into the SSD in April 2001.  Ms. Finn found the EPFs of SAIC Burch and another agent under Ms. Cheek's desk.  These files had never been opened, acknowledged, or filed,

and had been in SSD since April and July 2001, respectively.

•     Other important documents were sitting in piles around Ms. Cheek's desk.

•     No files on the budget for the last fiscal year could be found, but a large pile
      of papers dealing with the budget were found in no particular order.

•     Ms. Finn concluded that the administrative files of SSD were in the "worst
      shape" of any she had seen.  She noted that these were the same types of
      problems she had found in 2000 and that they were therefore long-standing.[11]

Def.'s Facts ¶¶ 36 & 37.

On January 31, 2002, SAIC Burch was advised that FedEx had called to inquire about 18 invoices (of which eight were dated before Ms. Cheek's car accident) that were delinquent, totaling almost $3,000.  On that same day, he was advised that Chesapeake Petroleum had contacted SSD to inquire about unpaid invoices dated June 14 and September 25, 2001, totaling approximately $5,200.  Chesapeake Petroleum was one of the vendors that hand-delivered its invoices.  Def.'s Facts ¶ 38.

Ms. Cheek returned to work on February 4, 2002.  SAIC Burch called her into his office with ASAIC Price and they had what appears to have been a most unpleasant interview.  SAIC Burch provided a copy of Ms. Finn's email report to Ms. Cheek, told her that she was an "[expletive

---

[11]   Ms. Cheek does not directly contest any of these facts, challenging instead Mr. Burch's alleged failure to discuss her job functions with her, his delay of six weeks into her absence to call for help from Ms. Finn, and his lack of knowledge as to whether her own response to Ms. Finn's criticism was accurate.  Pl.'s Facts ¶ 34.  Ms. Cheek's statement in a footnote that "Ms. Finn's evaluation was based on administrative duties which were not the plaintiffs [sic]" contains no record cite to any evidence in support.  A "mere unsubstantiated allegation . . . creates no genuine issue of fact and will not withstand summary judgment."  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

deleted] incompetent," and accused her of not paying bills and not performing her job as budget coordinator.  Pl.'s Facts ¶ 40.  He also gave her a draft copy of a mid-year review that outlined her deficiences.  Def.'s Facts ¶ 40.  He then told her to move to the receptionist desk and answer the telephone instead of performing budget coordinator duties.  While Ms. Cheek had been absent from work, SAIC Burch had hired Kathy Jolles to fill the Administrative Officer position.  It was SAIC Burch's intention to allow Ms. Jolles, who was due to start on February 11, 2002, to organize the administrative office and to determine how to incorporate Ms. Cheek and her budget coordinator position at an appropriate level and with supervisory oversight.  On February 6, 2002, SAIC Burch changed Ms. Cheek's work hours from 7:00 A.M.--3:30 P.M. to 8:30 A.M.--5:00 P.M. so that her hours would coincide with Ms. Jolles' hours, since Ms. Jolles would be her direct supervisor.

During her first week on the job, Ms. Jolles met with SAIC Burch and learned that the administrative work was not up-to-date, personnel files needed to be reviewed, and financial responsibilities with late invoices and bills needed to be corrected.  Pl.'s Facts ¶ 40.  SAIC Burch did not identify any specific individual associated with these problems but Ms. Cheek herself told Ms. Jolles about it.  *Id.*  "Ms. Jolles found some of the plaintiff's work as budget coordinator had not been getting done."  *Id.*  She noticed "a lot of confusion, a lot of mess" around her work area, which was the work station previously used by Ms. Cheek.  Def.'s Facts ¶ 43.

On February 18, 2002, Ms. Cheek gave SAIC Burch a written rebuttal to Ms. Finn's report.  SAIC Burch asked Ms. Jolles to review this rebuttal, which she did.  Ms. Jolles advised SAIC Burch that "very few, if any, of her rebuttals were valid."  *Id.* ¶ 44.[12]

---

[12]  Ms. Cheek admits in part and denies in part this information, asserting that SAIC Burch never "tasked his assistants to evaluate whether or not the plaintiff's responses were accurate."  Pl.'s Facts ¶ 44. Ms. Cheek provides no record cite to support this statement and it is

On or about March 26, 2002, SAIC Burch offered Ms. Cheek a temporary assignment in the Armor Section of SSD, which she accepted. She considered this assignment to be positive. In the Armor Division, Ms. Cheek was given substantive duties, including working on databases for the armored cars.

On April 16, 2002, SAIC Burch issued an "out-of-cycle" evaluation to Ms. Cheek and moved her back to the reception desk area to answer the telephones. In the evaluation, he rated her performance as "unacceptable."[13]

ASAIC Price became Acting SAIC when SAIC Burch left SSD on April 21, 2002. On April 26, 202, ASAIC Price returned her budget coordinator duties to Ms. Cheek and told her that he and Ms. Jolles would closely monitor her performance and reevaluate her after 30 days.

Ms. Cheek filed an administrative grievance regarding her out-of-cycle evaluation on April 26, 2002. Eric Harnischfeger, the Deputy Assistant Director for Protective Operations, rescinded the unacceptable evaluation on June 7, 2002, and changed it to reflect an overall rating of "acceptable." Mr. Harnischfeger placed Ms. Cheek on a 90-day probation period and told her that

---

repeated verbatim for numerous points in the historical record presented by Defendant's Facts. *See* Pl.'s Facts ¶¶ 34, 36, 37. The Court need not resolve this point as it is immaterial to the case. What is clear is that SAIC Burch was angry about the confused and messy state of administrative records in his division and faulted Ms. Cheek for the mess.

[13] While Ms. Cheek states that she admits these facts only in part, her version is the same in all material respects. *See* Pl.'s Facts ¶ 47 ("On April 16, 2002, ASAIC Price told the plaintiff to accompany him to the SSD Conference Room. At that time, she was given an unacceptable evaluation. Plaintiff refused to sign the evaluation. She was then taken out of the Armor Section and placed back answering telephones as her only duty."). Ms. Cheek's disagreement lies not with these facts but with an added point — "Plaintiff was not given a Performance Improvement Plan." *Id.* SAIC Burch intended to establish a performance improvement plan in the context of returning Ms. Cheek to her budget coordinator duties but left his position on April 21, 2002. Def.'s Facts ¶ 48.

she would receive another evaluation at its conclusion.  She received an acceptable rating for the probationary period on September 13, 2002.  Def.'s Facts ¶ 50.

### C.  Career-Ladder Promotion

Ms. Cheek expected to receive a career-ladder promotion from GS-9 to GS-11 in July 2002.  Such promotions are not automatic, and an employee must meet all eligibility criteria.  When Ms. Cheek requested a promotion to GS-11 in August 2002, she was still in the 90-day probationary period imposed by Mr. Harnischfeger and therefore ineligible.  When she received an acceptable rating for the probation period, she became eligible for promotion and was promoted to GS-11 effective September 22, 2002.[14]  Def.'s Facts ¶ 51.

### D.  EEO Complaint

While Ms. Cheek called the agency's EEO office in March of 2000, she did not file an informal complaint of retaliation until March 20, 2002.  She filed a formal complaint of discrimination on August 2, 2002.  The Agency accepted the follow issues for investigation:

> Whether the Complainant was discriminated against . . . in retaliation for her involvement in the EEO complaints process when management:
>
>> 1.  did not timely submit Complainant's application for the Donated Leave Program dated December 11, 2001, which resulted in Complainant not being available for the 'window'

---

[14]  Ms. Cheek states that she denies these facts in part but adds only argument, which will be considered as part of the Court's analysis.  *See* Pl.'s Facts ¶ 51 ("The verbal performance improvement plan (PIP) in this case affected the plaintiff's salary and benefits as the time she was promoted, in September 2002, she was not retroactively compensated back to July 2002, when she should have been promoted.  Thus, the verbal PIP and the failure to promote constituted an adverse employment action.")

Ms. Cheek recognizes that she did not file a grievance or seek EEO counseling in connection with the denial of her April 1, 2003, request for a desk audit of her position and that that issue, alleged in her Complaint at ¶¶ 38 & 40, is not before the Court.  *See* Pl.'s Facts ¶¶ 52, 53.

for donated leave at the end of the year;

2.  reassigned her from her position of Budget Coordinator to clerical duties upon Complainant's return to the office on February 4, 2002, and told her she was incompetent;

3.  changed Complainant's duty hours on February 4, 2002;

4.  issued Complainant an unacceptable performance rating in April 2002 without any documentation;

5.  held Complainant accountable for late payment of bills, whereas a male coworker was not held accountable; and

6.  did not promote Complainant to a career ladder, GS-11 promotion in July 2002."

Def.'s Facts ¶ 54.

Ms. Cheek agreed with the agency's statement of issues to be investigated.[15]  After the agency issued its Report of Investigation, Ms. Cheek requested a hearing before an Administrative Law Judge.  The case was referred to pre-hearing mediation, which was unsuccessful. Following mediation, Ms. Cheek filed this suit.  As a result the agency never issued a final decision on the merits of her administrative complaint.

E.  Plaintiff's Complaint

Plaintiff's complaint alleges that Defendant retaliated against her for her protected EEO activities, her complaints of discrimination and retaliation that she raised with Defendant's supervisors and with the Defendant's EEO office.  Thus, she alleges that Defendant retaliated against her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e -- 2000h.  Defendant has

---

[15]  Ms. Cheek asserts that she was transferred to the Armor Section within 15 minutes of her concluding a conference call with EEO Counselor Ernestine Howard on March 26, 2002. Pl.'s Facts ¶ 54.  Not only was this transfer not part of Ms. Cheek's EEO charge but she herself considered it a "positive" change with more substantive duties than answering the telephone.

moved for summary judgment on the complaint.

The complaint alleges that Defendant retaliated against Plaintiff by taking various adverse actions.  However, Ms. Cheek has conceded that the following actions do not rise to the level of an adverse employment action:  1) the timing of her approval for donated leave; 2) the alleged rude comment by her supervisor; 3) the minor change in her work hours; and 4) the rescinded "unacceptable" performance rating.[16]  Ms. Cheeks further concedes that the purported delay in the approval for donated leave also does not rise to the level of an adverse action.[17]  Thus, the Court will focus on Plaintiff's allegations that Defendant retaliated against her by temporarily changing her duties upon her return to work in February 2001 and by delaying her promotion to GS-11.

## II.  LEGAL STANDARDS

A.  Jurisdiction

Federal district courts have original jurisdiction over civil actions arising under federal statutes.  28 U.S.C. § 1331.  Here, Plaintiff brought suit under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e -- 2000h-6.  As this case presents a question of federal law, this Court has

---

[16]  Plaintiff states that "the defendant's reliance on the changing of plaintiff's hours, the out-of-cycle performance [appraisal] and the verbal abuse is misplaced.  The focus of the inquiry concerns the removal of the plaintiff's duties."  Pl.'s Opp'n at 30.

[17]  It is undisputed that Ms. Cheek was approved for donated leave on December 28, 2002, that she received a total of 156 hours of donated leave, and that this donated leave provided her full pay for the entire period of her absence.  Defendant argued that the purported delay in her approval could not possibly rise to the level of an adverse action and Ms. Cheek made no response in her Opposition.  This point is deemed conceded as well.  "It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

original jurisdiction.

B. <u>Standing</u>

Standing to invoke the jurisdiction of the federal courts under Article III of the Constitution requires a plaintiff to show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).   Plaintiff in this case has standing to bring suit.  She alleges an injury in fact, that she was injured by Defendant's alleged retaliation against her for her protected EEO activities.

C. <u>Summary Judgment Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson*, 477 U.S. at 248 (1986).  A "genuine issue" is one whose

resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*  In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.  ANALYSIS

To survive a motion for summary judgment, a plaintiff must demonstrate retaliation by a preponderance of the evidence.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  This requires first establishing a *prima facie* case that gives rise to an inference of retaliation.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981).  If a *prima facie* case is made, the burden shifts to the agency to articulate a legitimate, non-discriminatory

-15-

reason for its actions. *McDonnell Douglas,* 411 U.S. at 802; *see Burdine*, 450 U.S. at 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons."). If the agency defendant articulates a legitimate nondiscriminatory reason for its actions, the inference of discrimination is removed, and the plaintiff must "[p]rove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation]." *Burdine*, 450 U.S. at 253.

To establish a *prima facie* case of retaliation, a plaintiff must show that: 1) she engaged in protected activity; 2) she suffered an adverse employment action; and 3) a causal connection exists between the protected activity and the adverse action. *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). The causation component may be shown by demonstrating that the employer had knowledge of the plaintiff's protected EEO activity and that the employer took the adverse employment action shortly thereafter. *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998).

Defendant concedes that Ms. Cheek engaged in protected activity when she contacted the EEO Office in 2000 and 2002, and when she pursued an EEO complaint in 2002. However, Defendant denies 1) that Ms. Cheek suffered an adverse employment action and 2) that any of the employment decisions affecting her in February through September 2002 were caused by her EEO activity.

"[N]ot everything that makes an employee unhappy is an actionable adverse" action under Title VII. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *accord Russell v. Principi*, 257 F.3d 815, 818 (D.C. 2001). "Actions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count." *Forkkio v. Powell*, 306 F.3d

1127, 1131 (D.C. Cir. 2002).

Some types of adverse actions are obvious, such as discharge or failure to promote. For those that are less clear, a plaintiff must show an action with "materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities." *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). The employment decision must inflict "objectively tangible harm." *Russell,* 257 F.3d at 818. "An employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (citation omitted).

A. <u>Assignment to Receptionist Duties</u>

Ms. Cheek points to the change in her duties imposed by SAIC Burch in February 2002, when he relegated her to answering the telephone instead of performing the budget coordinator function of her job, as a "tangible change" in duties and working conditions sufficient to constitute an adverse action. Defendant responds that a temporary reassignment without any loss of pay or benefits is not an adverse action. Ms. Cheek was reassigned by SAIC Burch on February 4, 2002, and restored to her normal job function by ASAIC Price on April 26, 2002. SAIC Burch testified that he intended the new duties to be temporary and he was merely awaiting the arrival of the new Administrative Officer, Ms. Jolles, to organize the administrative functions and provide direct supervision for Ms. Cheek. At the time, Ms. Cheek was not told of this plan and did not know the duration of the assignment.

A temporary assignment does not constitute an adverse action. *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 847-48 (D.C. Cir. 2001), made this point emphatically:

"Quite simply, a temporary assignment to a less desirable task does not create liability under Title VII unless it results in diminution in pay or benefits or affects such things as future employment opportunities . . . ." *See also Brown*, 199 F.3d at 457 ("While Brown was temporarily reassigned to a position she thought undesirable . . . there is no objective basis for finding that she was harmed by [this] decision[] in any way."). Ms. Cheek responds that the "reassignment delayed the plaintiff's promotion and full performance level for several months" after she had met her time in grade for promotion in July 2002. Pl.'s Opp. at 30. There is no support for this argument. Ms. Cheek's promotion was delayed by the 90-day probationary period imposed by Deputy Assistant Director Harnischfeger; nothing in the record suggests that the assignment to receptionist duties for two months in the spring of 2002 affected the timing of the promotion.

The job assignment and the probationary period are related, as each was a response to Ms. Cheek's job performance. Otherwise, they represent decisions by different persons at different times for somewhat different reasons. It appears that Ms. Cheek could keep numerous balls in the air, over her messy office filled with paper and overdue bills, as long as she was at work, but that they fell to the ground with a thud as soon as she was on extended leave. The assignment to receptionist duties was SAIC Burch's reaction to Ms. Finn's report and his desire to have more immediate supervision over Ms. Cheek before she resumed her budget coordinator duties. Deputy Assistant Director Harnischfeger faced different terrain in June 2002, when he was reviewing Ms. Cheek's grievance over the unacceptable rating. While he granted the grievance and changed the rating to acceptable, he recognized that there was a performance problem nonetheless, which caused

him to impose a 90-day probationary period.[18]   While Ms. Cheek minimizes their impact, she admits many of the identified performance problems.

Defendant argues that even if Plaintiff's assignment to receptionist duties was an adverse employment action, Ms. Cheek failed to show that the assignment was caused by an illegal retaliatory motive.  In order to show causation, that a plaintiff's protected EEO activity caused her employer to retaliate against her, a plaintiff must show that the official responsible for the alleged adverse employment action had knowledge of the protected activity. *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).  A plaintiff may rely on temporal proximity to prove causation, but such proximity must be "very close." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  For example, courts have held that time lags of more than three months are too long to show causation. *Breeden*, 532 U.S. at 273-74 (20-month lag; citing with approval *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (3-month lag)); *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 94 (D.D.C. 2004) (3-month lag and 15-month lag).

Here, Ms. Cheek engaged in EEO activity in March 2000 when she called the EEO office two or three times and again when she filed an informal complaint in March of 2002 and a formal complaint in August of 2002.  Ms. Cheek presented no evidence that SAIC Burch knew that she had contacted the EEO office in March of 2000, making it impossible to establish a causal connection

---

[18]   Ms. Cheek suggests that Mr. Harnischfeger's act in granting her grievance, rescinding her unacceptable performance rating, and placing her on probation, constituted an adverse employment action.  Pl.'s Opp. at 34 ("On June 10, 2002, the plaintiff received a favorable response to her grievance and was given an acceptable rating. . . . And yet, on June 10, 2002, plaintiff [was] placed on an [sic] supposed 90-day performance improvement plan.  This would make a reasonable jury believe that the PIP was retaliatory.")  Ms. Cheek never made such a claim at the administrative level and is barred from raising it now. *See, e.g.*, *Bowden v. U.S.*, 106 F.3d 433, 437 (D.C. Cir. 1997).  The Secret Service disputes that Ms. Cheek was on a PIP and not on a 90-day probationary period.  Def.'s Reply at 9.

between her actions in 2000 and his action in reassigning her duties in February of 2002.  Even if

SAIC Burch did know about Ms. Cheek's phone calls to the EEO office in 2000, the Court cannot

infer a causal connection to employment actions taken two years later in 2002.  The long period of

time between the two events destroys any inference that they were causally connected.

Ms. Cheek does not rely solely on her March 2000 EEO activity to demonstrate that

the receptionist assignment was retaliatory.  Rather, she says that she "opposed any practice" within

the meaning of Title VII[19] due to her history concerning Jack Henderson's promotions and her

complaints to agency supervisors.  Pl.'s Opp. at 32-33.  She argues:

> It strain[s] credulity to believe that the plaintiff's complaints and effort to
> receive her pay increase while complaining about Henderson's efforts to use
> her job duties to support his pay increase had no effect on either Henderson
> or the male dominated supervisory atmosphere she worked in.  A reasonable
> jury could conclude that Henderson as well as other[s] were lying in wait.
> They only had to wait until November 2001 when the plaintiff was injured.

*Id.* at 33.  This argument has no merit.  Complaining about Mr. Henderson's promotions was not

protected activity under Title VII.  According to Ms. Cheek, Mr. Henderson "had an ace in [the]

hole.  He drove the Director of the Secret Service under Directors Merletti and Stafford.  Thus, he

had access to the highest level of the Secret Service and [the] obvious ability to get what he wanted."

*Id.*  Assuming for present purposes that Ms. Cheek's suppositions could constitute evidence and are

true, they indicate no unlawful bias.  Due to the nature of his job, Mr. Henderson allegedly had

access to senior decisionmakers while Ms. Cheek's job did not afford her that opportunity.  Mr.

Henderson allegedly took advantage of his connections while she could not.  The difference was one

---

[19] *See* 42 U.S.C. § 2000e-3(a) (unlawful for an employer to discriminate against an
employee "because he has opposed any practice made an unlawful employment practice by the
law, or because he has made a charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this subchapter").

of geography and not any protected class under Title VII.  In addition, Mr. Henderson had no role in SAIC Burch's decision to assign Ms. Cheek to receptionist duties, so whether or not he was "lying in wait" is irrelevant (and unsupported).

The Court concludes that the assignment of receptionist duties to Ms. Cheek from February 8 to April 26, 2002, did not, on these facts, constitute an adverse employment action.  Were it to be found an adverse employment action, Ms. Cheek presents no evidence from which one could connect the action to any of her protected activity.

B.  Delayed Promotion

Ms. Cheek had enough time in grade to receive a career-ladder promotion in July 2002.  She asked ASAIC Jensen for that promotion in August 2002.  He denied her request because she was on an unfinished 90-day probationary period during which she had to demonstrate acceptable performance in order to qualify for the promotion.  Notably, there is no basis for inferring retaliatory animus by ASAIC Jensen; there is no allegation that he was involved in any of the employment decisions of which Ms. Cheek complains.

Deputy Assistant Director Harnischfeger placed Ms. Cheek on probation in June of 2002.  Ms. Cheek argues that imposition of the probationary period was retaliatory.  She connects it to her protected activity by noting that the EEO office added a charge of retaliation to her informal EEO complaint after she received the unacceptable performance rating in April and complained about it; that she received a favorable response to her administrative grievance on the unacceptable rating on June 10, 2002; and that on that same date, she was placed on probation.  From this, she urges the Court to find that "it is reasonable to assume that the agency knew of her [retaliation] complaint" and that the sequence of events and dates is sufficient to "make a reasonable jury believe

that the [probation period] was retaliatory." Pl.'s Opp. at 34.  Citing *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999), Ms. Cheek asserts that she has met her burden, as she is required to show only that the protected activity and the adverse action were not wholly unrelated. She recognizes, however, that she also must show "that the decision maker was aware of the protected conduct at the time of the adverse employment action."  *Id.* (citing *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000).

      Ms. Cheek's argument in this respect fails to mention the most crucial figure: Deputy Assistant Director Harnischfeger.  Mr. Harnischfeger is the supervisor who granted Ms. Cheek's grievance and imposed the probationary period.  Without any record citation, Ms. Cheek states that Peter Schwartz, Jack Henderson, James Burch, Jerry Price, and Kathy Jolles knew of her EEO complaints, although she relies on a "reasonable inference" concerning Mr. Henderson.  Pl.'s Opp. at 35.  Ms. Cheek's allegation that James Burch became aware of her activities on March 20, 2002, "if not sooner" has no record support, and SAIC Burch's testimony was directly to the contrary. Def.'s Facts ¶ 56.  Ms. Cheek acknowledged in her deposition that she did not know whether SAIC Burch was aware of her March 2002 informal complaint.  *Id.*  Without evidentiary support, she cannot now proclaim certainty on the point.  More critically, Ms. Cheek makes no argument and offers no facts to suggest that Deputy Assistant Director Harnischfeger possessed the requisite knowledge.  Timing alone cannot supply this critical element of Ms. Cheek's case.

      The Court finds that Ms. Cheek has failed to establish a *prima facie* case that the probationary period was imposed in retaliation for her complaint activity.  While she had engaged in protected activity by filing and modifying an informal EEO complaint and the probationary period was an adverse action because it delayed her salary increase, she has shown no causal connection

between the two.  Ms. Cheek has provided no evidence to support the argument that the probationary

period violated Title VII.  Ms. Cheek was not eligible for her career-ladder promotion in July 2002

because she was not performing at an acceptable level since she was on probation.   Therefore, there

is no merit to Ms. Cheek's claim that her delayed promotion violated Title VII.[20]  This allegation will

be dismissed.

## IV.  CONCLUSION

Having found that Ms. Cheek has failed to make out a *prima facie* case of illegal

retaliation in violation of Title VII, the Court will grant Defendant's motion for summary judgment

and will dismiss the complaint.  A memorializing order accompanies this memorandum opinion.

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: March 17, 2006

---

[20]  Having found that Ms. Cheek has failed to present a *prima facie* case, the Court need
not address the parties' arguments concerning pretext.